**MONROE HARDWARE CO., Inc., v. MONROE TRANSFER & WAREHOUSE CO., Inc., et al.**

**No. 5202.**

Court of Appeal of Louisiana.
Second Circuit.

April 30, 1936.

Madison, Madison & Fuller, of Monroe, for appellants.

Theus, Grisham, Davis & Leigh, of Monroe, for appellee.

DREW, Judge.

Plaintiff sued for damages to its automobile caused by a collision with the truck owned by defendant and at the time being operated by its employee in the scope and course of his employment. It prayed for judgment in solido against the owner of the truck and its insurer.

The collision occurred in the early afternoon of June 9, 1934, at a point about ten miles north of Monroe, La., on the paved highway leading from Monroe to Sterlington and Bastrop. The truck of

the defendant had attached thereto a trailer, the truck and trailer being 28 feet in length. The body of the trailer was much wider than the cab of the truck and extended out on each side a distance of 15½ inches further than the truck cab, and to that extent obscured the view of one approaching from the rear of any movement or action of the truck driver. The collision occurred on a straight stretch of road which was straight for a distance of practically three-fourths of a mile to the north. Both the truck of defendant and the car of plaintiff were traveling in a notherly direction, the car trailing the truck. The two vehicles remained in this position for quite a distance and until several curves in the road had been passed and they both had reached this straight stretch of road, at which time the driver of the car blew its horn and increased its speed for the purpose of passing to the left of the truck. At about the same moment plaintiff's driver pulled the car to the left of the road and increased the speed of the car, the truck began a left turn into a road leading to a carbon plant, which was its destination. The brakes were immediately applied on plaintiff's car, and it skidded a distance of approximately 42 feet and collided with the truck at a point about the back wheel of the trailer.

The acts of negligence relied upon by plaintiff to recover are set out in its petition in articles 5 and 6, and are as follows:

"The road ahead of Hundley was straight and clear for about one-half (½) of a mile, or more, with nothing in sight to prevent him from passing the truck in safety. Nothing on the road could be seen except the truck he was passing, nor could he see anything on either side of the road to indicate or suggest any danger whatsoever in passing said truck, and believing that he had a perfectly safe way of passing it, and relying on the driver of said truck to keep on the east side of the black center line on the highway, and otherwise to comply with his duty as a driver upon a public highway, said Hundley speeded up petitioner's automobile sufficiently to pass the truck, and was in the act of passing said truck, when suddenly, negligently, carelessly, and without any regard whatsoever for the safety of the said Hundley, or any one else lawfully using said highway, and when petitioner's car was within twenty (20) feet, or less, of the rear end of the trailer, and traveling at a faster rate of speed than the truck and trailer for the purpose of passing them, the truck driver suddenly made a left turn across the road in front of your petitioner's automobile, that is, that part of the highway west of the black center line, and upon and against petitioner's automobile.

"The driver of said truck did not blow his horn, did not hold out his hand, did not slacken the speed of his truck, did not look ahead and behind to see if he could turn from his straight course in safety, nor did he do anything whatever to indicate that he expected to make a left turn, but kept travelling straight ahead at a rate of speed of about thirty (30) or thirty-five (35) miles per hour, and made said left turn in front of petitioner's car. * * *

"That when said truck suddenly made the left turn, as above described, there was no way for Hundley to pass in front of it, nor to pass behind it, so, apparently, the only thing he could do was to put on his brakes, with the hope of stopping petitioner's car before the truck struck it. Accordingly, upon seeing the truck turn across the road in front of him, he, the said Hundley, applied his brakes and skidded the car until the truck collided with it at the edge of the west side of the highway; said Hundley was confronted with an emergency, not of his own creation, and did the best he could."

It further pleaded that defendant's driver had the last clear chance to avoid the accident. Liability on the part of both defendants is admitted, provided there is found to be liability on the part of the owner of the truck. The acts of negligence alleged by plaintiff are denied by defendants, and in articles 11 and 12 of the answer they set up their defense. It is as follows:

"Defendants show that said truck was being operated on said highway in a careful and lawful manner; and that its destination was a place about seventy yards west, or approximately west, of the point of collision, to reach which it was necessary for the truck to leave the highway and travel along a dirt road intersecting the highway at that point, that is, making a right angle turn to the left, into said road at its intersection with the highway; that, upon approaching this intersection, the driver of the truck slowed it down, held out his hand as a signal for the turn he was about to make, looked to the front

and to the rear and, seeing no cars or other traffic within a distance which would make the turn dangerous and having otherwise complied with the law, proceeded to turn the truck into the road leading to the left; and that, when the main portion had cleared the highway and when the entire right or east half of the highway was clear, the left side of the rear portion of the trailer was struck by said automobile. Defendants show that said accident in no wise resulted from any fault or negligence on the part of the driver of the truck and that said driver was entirely free from fault or negligence. * * *

"In the alternative and in the alternative only, defendants show that if this Honorable Court should find the driver of the truck guilty of any negligence and that such negligence contributed to the accident, which defendants deny, defendants show that the driver of the automobile belonging to plaintiff was guilty of contributory negligence which continued down to the very moment of and was the proximate cause of the accident, which contributory negligence bars any recovery by plaintiff. Defendants show that this contributory negligence on the part of the driver of plaintiff's automobile consisted in: 1. Operating the car at an excessive speed, 2, Failing to keep said automobile under proper control so that he could stop it or maneuver it as might be necessary within the assured clear distance ahead, 3. Failure to give proper warning of his determination to endeavor to pass the truck, 4. Running into the truck on the wrong side of the road when he could have passed safely by staying on the right or proper side of the road, and 5. Particularly, operating said automobile in violation of Paragraphs a, b, c, d and e of Rule 7, Title II, of Act 21 of the Louisiana Legislature for the year 1932. Accordingly, in the alternative, defendants specially plead contributory negligence."

Plaintiff prayed for judgment in the sum of $572.14, with legal interest thereon from judicial demand. The lower court awarded judgment for plaintiff in the sum of $450, with legal interest from judicial demand, and defendants prosecute this appeal. Plaintiff has answered the appeal and prays that the judgment be increased to the amount sued for.

If the driver of the truck owned by defendant was not guilty of actionable negligence, it will not be necessary to discuss the plea of contributory negligence urged in the alternative by defendant. We will therefore discuss that question first.

The act of the Legislature governing in this case is Act No. 21 of 1932. The pertinent parts of said act are as follows:

"Title II. * * * Section 3. * * *

"Rule 4. (Speed—General Rule).

"(a) Except as herein provided and subject to the provisions of Rules 3 and 17, and subject to the special speed limits specified in this Act, it shall be unlawful for any person to drive or operate any motor or other vehicle upon the public roads, highways and bridges of this State at other than a careful, prudent, reasonable and proper speed, having due regard to the traffic, surface and width of the highway, the location and neighborhood, and any other conditions or circumstances then existing, and no person shall, under any circumstances or conditions, drive any vehicle upon the public roads, highways or bridges of this State, at such a speed as will endanger the life, limb or property of any other person; and, subject to the special provisions and limitations contained in this Act, the person so driving or operating, or causing to be driven or operated, a motor vehicle on such public roads, highways and bridges, shall be held and deemed to be prima facie at fault in and responsible for any accident or damage proximately flowing therefrom or connected therewith, which presumption, however, may be rebutted and overcome by proper showing of the contrary. * * *

"Rule 7. (Overtaking Motor Vehicle).

"(a) The driver of any vehicle over-taking another vehicle proceeding in the same direction shall pass at a safe distance to the left thereof and shall not again drive to the right side of the highway until safely clear of such overtaken vehicle.

"(b) The driver of an overtaking vehicle shall give audible and sufficient warning of his intentions before overtaking, passing or attempting to pass a vehicle proceeding in the same direction.

"(c) The driver of a vehicle shall not drive to the left side of the center line of the highway in overtaking and passing another vehicle traveling in the same direction, unless such left side is clearly visible and free from oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be made in perfect safety; provided, that whenever an acci-

dent occurs under such circumstances, the responsibility therefor shall rest prima facie upon the driver of the vehicle doing the overtaking or passing.

"(d) The driver of a vehicle shall not overtake and pass another vehicle proceeding in the same direction, approaching the crest of a hill or substantial grade, or upon a curve in the highway or elsewhere, where the view of the driver doing the overtaking or passing is obstructed within a distance of five hundred (500) feet.

"(e) The driver of a vehicle shall not, under any circumstances, overtake or pass another vehicle proceeding in the same direction at any steam, electric or other railroad grade crossing or any intersection of the highway, unless permitted or instructed to do so by a duly authorized traffic or police officer. * * *

"Rule 10. (Signals on Starting, Stopping or Turning).

"(a) The driver of any vehicle upon a public road, highway or bridge of this State, before starting, stopping or turning from a direct line shall first see that such movement can be made in safety, and, if any pedestrian may be affected by such movement, shall give a clearly audible signal by sounding the horn; and, whenever the operation of any other vehicle may be affected by such movement, shall give a signal as required in this section, plainly visible to the driver of such other vehicle, of the intention to make such movement.

"(b) The signal herein required shall be given either by means of the hand and arm in the manner herein specified, or by a mechanical or electric signal device approved by the Department, except that when a vehicle is so constructed, loaded or operated as to prevent the hand and arm signal from being visible, both to the front and rear, the signal must be given by a device of a type which has been approved by the Department. Whenever the signal is given by means of the hand and arm, the driver shall indicate his intention to start, stop or turn by extending the arm with the hand open and the back of the hand to the rear, out from and beyond the left side of the vehicle in the following manner:

"Left turn—Extended horizontally.

"Right turn—Extended upward at an angle of forty-five (45) degrees from shoulder or elbow.

"Stop-start—Extended downway at an angle of forty-five (45) degrees from shoulder or elbow.

"Pulling from curb or side of highway—Same as for left turns."

Defendants urge rule 7, subsection (e), of said act for the purpose of showing that the defendant's driver was justified in making the left turn under the presumption that the car of plaintiff would not violate the law by attempting to pass the truck at an intersection.

Was the road into which defendant's truck turned an intersection within the intendment of the act?

The record discloses that the road does not cross the highway. It makes off from the highway at right angles. There is no bridge across the ditch on the side of the highway. A vehicle making use of this road leaves the highway, goes down into a ditch, and then through a space between two posts where once hung a gate, and continues through a lane, which is fenced on both sides, for a distance of approximately 90 yards to a carbon plant. The road is not graded or graveled and is so narrow that two vehicles cannot pass on it. It is used by those having business with the carbon plant and the employees of said plant. There is some testimony that it is also used by several people who live back of the plant. There is no evidence to show that the road was ever graded or worked, and there is no testimony to show that it is not privately owned. After it leaves the public highway it leads only to private property. It is a very obscure road and cannot be seen by any one travelling on the highway in the direction that plaintiff's car was, until it is reached, due to the fact that it is not graded up and has no bridge from the highway across the ditch. It is further obscured and hidden from view by grass and weeds growing on the side of the highway and in and across the ditch to the left of the highway, which is shown by a photograph in the record taken from a point south of where the road makes out from the highway. An automobile was standing in said road when the picture was taken in order that you could be able to know where the road was.

■■ "Private road" is defined in the act as a road not open to the use of the public *as a matter of right*. The record fails to disclose this fact. The road may be, and no doubt is, on the private property of the carbon company. If so, there is no law to prevent its closing of the road at will. Defendants urge that it is a public road and therefore forms an intersection.

where it connects with the highway, and the burden is on them to establish that fact. In this they have failed, and we are convinced that the road is not a public road or highway within the intendment of the act.

Defendants also rely on subsection (c) of rule 7 of said act, and contend that under said subsection, when any accident occurs at a time an overtaking automobile attempts to pass the car ahead of him, the responsibility therefor shall rest prima facie upon the driver of the vehicle doing the overtaking and passing. The subsection relied upon has no application under the undisputed facts in this case, and it does not in any instance mean or state the interpretation given it by defendants. It only applies when the left side of the road is not clearly visible and is not free from oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be made in perfect safety. The undisputed facts here are that the road was straight for a distance of approximately three-quarters of a mile north of the point of collision and there was no oncoming traffic within that distance, which was certainly a sufficient distance to permit the passing to be made in safety.

The driver of plaintiff's car and his son, who was on the seat with him, testified that they trailed defendant's truck for more than a mile where the highway was curved, and upon reaching the straightaway in the road and upon nearing the truck, the car horn was audibly sounded to warn the truck driver of their intention to pass, and soon thereafter the car was pulled to the left side of the road and its speed increased to approximately 50 miles per hour in order to pass. They both testify that they were looking at the truck and did not see any sign given by the driver of his intention to turn left across the road; that they did not know there was a road leading off to the left and they could not see the road; that the horn of the truck was not sounded; and when their car was approximately 60 feet to the rear of the truck and entirely on the left side of the road for the purpose of passing, that the truck started a gradual turn to the left. The paved road was 20 feet wide and the truck 28 feet long, and when the truck part turned across the left side of the road the trailer part likewise blocked the right side of the road. Almost, if not exactly, at the same instant the truck began its left turn, plaintiff's driver applied the brakes to the car, which worked effectively, locking the wheels and causing the car to skid a distance of 42 feet to the point of impact. As soon as the brakes were applied, the car was veered to the left in the direction the truck had turned in order to lessen the impact of the collision which then was imminent. That plaintiff's car was traveling straight and entirely on the left side of the road in the act of passing when the brakes were applied is clearly established by two highway officers who officially inspected the scene of the accident soon after its occurrence. If this testimony be accepted as true, after the truck started its left turn, plaintiff's driver had less than one second within which to act before the collision if he continued at the rate of 50 miles per hour. No doubt the brakes slowed the car down some, but even then there could have been very little time left within which to act.

To rebut this testimony, the defense used the driver of the truck and several other colored witnesses who claimed to have seen the truck a short time before the accident. The truck driver testified that when he was about two blocks, or 600 feet, from the place of the accident, he looked back and saw plaintiff's car approximately one-quarter of a mile behind him; and when he reached a point about one block, or 300 feet, from the place of the collision he again looked back and saw plaintiff's car was about one block, or 300 feet, behind him. It was at this time, he says, he blew his horn and held out his hand signifying he intended to make a left turn. According to this testimony, plaintiff's car was traveling three times as fast as defendant's truck, and to the knowledge of the truck driver, and when he saw the car only 300 feet behind him at a time he was 300 feet from the dirt road which he intended to turn into, it must have been apparent to any reasonable man that he could not negotiate the turn in safety to himself and others, and he should have waited until plaintiff's car passed before attempting it. One attempting a left turn must be sure it can be done in safety to himself and others. He stated that he did not hear the horn on plaintiff's car blow. He also stated that he did not make a gradual left turn, but that he drove the truck to a point even with the dirt road and turned in at a sharp angle.

In some of his testimony he is corroborated by two negro women who were seated on the gallery of a house near the place of

the accident, and who testified that he did blow the truck's horn and hold out his hand. They did not see plaintiff's car due to the fact their vision for any great distance down the road was obscured by the house, the gallery of which they were on. It is also corroborated by two fellow employees who were at the carbon plant some 90 yards away and who claim they saw the truck driver by looking through the vacant space between two houses on the left side of the road near the scene of the accident, and that they heard him blow the horn of the truck and saw him hold out his hand. How far out of the cab he held his hand is not shown by the truck driver or any other witness. One of the witnesses for defendants, who was at the carbon plant, was asked on cross-examination when the hand was held out, and replied that it was just at the instant the truck began to turn. If this be true, it was an idle thing to do, for it was then too late to avoid the collision even though the driver of the plaintiff's car saw his hand the instant it protruded from the cab of the truck. If the truck driver gave the signal with his hand when 300 feet south of the dirt road, it is reasonable to believe that the driver of plaintiff's car did not see it due to the obstruction to his view by the wide trailer of the truck. At that time, according to the truck driver's testimony, plaintiff's car was behind him. It is not claimed by any witness that it had taken the left side of the road 600 feet south of the dirt road, and, therefore, being on its right side of the road, the truck driver's hand could not have been seen by the plaintiff's driver unless the hand extended out the left side of the cab for a distance of more than 15½ inches. There is no testimony as to how far out the cab window the hand protruded, and unless it was held out far enough to be seen by one trailing the truck, it was the same as if no signal was given.

Act No. 21 of 1932, § 3, rule 10, subsec. (a), provides that a signal of intention to make a turn shall be given so as to be plainly visible to the driver of the trailing vehicle; and subsection (b) of the same rule provides that whenever a vehicle is so constructed, loaded, or operated as to prevent the hand and arm signal from being visible to the front and rear, the signal must be given by a device of a type which has been approved by the Department. It is not shown that the truck was equipped with any such device, and we are firmly of the opinion that when the vision of the hand and arm signal is obstructed by a trailer, load, or otherwise, to the extent of as much as 15½ inches, as in this case, a device for the giving of the signal should be installed on the vehicle. It is common knowledge, gained from observation, that few drivers ever extend their entire arm out the window in giving of a hand signal, and more often than otherwise the elbow rests on the door when the signal is given. Without some testimony that the truck driver extended his arm and hand far enough out the window for it to be seen by plaintiff's driver, we are forced to assume that it was not, in the light of the testimony of the driver and his son, who were in plaintiff's car at the time, that they did not see any signal given although they were both looking at the truck.

Although those in the trailing car testified they did not hear any horn sounded by the truck driver, we might assume he did sound his horn, and it could not avail him anything to relieve him of his negligence, for the reason that the law does not require the sounding of a horn when going to make a turn when it affects only the operation of some other vehicle. The law is different when it affects the action of a pedestrian; then the horn must be sounded. Act No. 21 of 1932, § 3, rule 10, subsec. (a). Under the law, therefore, the sounding of the horn, if heard by plaintiff's driver, would not necessarily have given him warning that the truck was going to turn to the left. It is most likely that he would have thought the truck driver was blowing for something he saw in the road ahead.

We therefore conclude that the driver of defendant's truck did not comply with the law as to signals before making the left turn into the path of plaintiff's car, and that he made the turn at a time when it was unsafe to so do, and his negligence in this respect is actionable negligence and at least a proximate cause of the accident. And if we should find plaintiff's driver was not guilty of contributory negligence which constituted a proximate cause, then the truck driver's negligence will become the proximate cause.

The first allegation of contributory negligence is that plaintiff's driver was operating the car at an excessive speed. The record discloses that the truck, just prior to beginning its turn, was traveling at a rate of speed of from 25 to 35 miles per hour; that plaintiff's car was traveling 40 to 45 miles per hour, and after pulling to

the left side of the road for the purpose of passing the truck, the speed was accelerated to 50 miles per hour. The highway was paved, it was straight for approximately three-quarters of a mile ahead, there was no vehicle or pedestrian in sight on the road or on the side of the road, and there was no negligence in operating the car under these conditions at a speed of 50 miles per hour.

■ The next allegation of contributory negligence is that plaintiff's driver failed to keep the car under control so he could stop it within the assured clear distance. This allegation is without merit for the reason given in the discussion of excessive speed, and for the further reason that the plaintiff's driver was not called upon or required to anticipate that the truck driver would violate the law or that he would change the course of the truck by turning from the direct line in which he was traveling.

■ The next charge of negligence is that plaintiff's driver failed to give warning that he was going to pass. The evidence discloses that the warning was given by audibly sounding the horn.

■ The next charge is that plaintiff's driver was negligent in running into the truck on the wrong or left side of the road when he could have passed to the right of the truck. We have discussed this charge of negligence in reviewing the testimony as to defendants' negligence, and have shown that the driver of the car had less than one second to act after the truck began its turn, and that he veered to the left for the purpose of lessening the impact. Due to the emergency and the short time within which he had to act, whether his judgment was good or bad is immaterial and under the circumstances does not constitute negligence. White v. Kennedy, 17 La.App. 315, 135 So. 694, 695.

■ The last charge is that the car was operated in violation of Act No. 21 of 1932, title 2, § 3, rule 7, subsecs. (a), (b), (c), (d), and (e). Subsection (a) has no application here, as it was impossible for plaintiff's car to be driven to the left of defendant's truck due to the fact that the truck had the road blocked and there was no opportunity to regain the right side of the road after passing for the reason the truck was never passed. Subsection (b) has been discussed by us previously in this opinion and there was no violation of that subsection. Subsection (c) has been heretofore disposed of in this opinion and there was no violation of it by plaintiff's driver. Subsection (d) has no application here for the reason there was no hill or grade or curve in the highway at the place of the accident, or for three-quarters of a mile north of that point, and the view of the driver was not obstructed within a distance of 500 feet. We have heretofore in this opinion discussed and disposed of subsection (e) adversely to defendants' contention.

We therefore conclude there was no contributory negligence on the part of the driver of plaintiff's car, and the sole proximate cause of the collision and resultant damage to plaintiff's car was the negligence of the driver of defendant's truck.

■ The remaining question is the amount of the award. The damaged automobile was a 1932 model Dodge. There is no claim that it was totally destroyed. It was badly damaged and required many new parts to put it back in as good condition as it was prior to the accident. This plaintiff is entitled to have done. The car had not been repaired at the time of trial. If it had been repaired and the charges were not shown to be exorbitant or padded, there would be little trouble in arriving at a just reward.

There are three estimates filed in evidence as to the cost of placing the car in as good condition as it was before the accident. The estimates vary widely. The highest was made by the authorized Dodge dealer in Monroe, La., and is $572.14. The lowest, which was made by the Duco Shop, is $264.26. A goodly part of the repairs could not be made by this concern and they planned to let it out to other companies to do. Some of the bids called for straightening the bent parts and other bids called for new parts.

The testimony as to the just amount due plaintiff is very unsatisfactory as the basis for a decision, since no member of this court is a mechanic. We presume the district judge was in the same dilemma and, after checking the three estimates the best he could, arrived at an amount of $450 as just. We know of no reason we could give for changing the amount of the award, and feel satisfied it will do justice between all parties.

The judgment is therefore affirmed, with costs.